MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2022 ME 55
Docket:       Pis-21-378
Argued:       September 8, 2022
Decided:      November 10, 2022

Panel:        MEAD, JABAR, HORTON, CONNORS, and LAWRENCE, JJ.

STATE OF MAINE

v.

CHRISTOPHER HALLOWELL

MEAD, J.

[¶1] Christopher Hallowell appeals from a judgment of conviction for attempted murder (Class A), 17-A M.R.S. §§ 152(1)(A), 201 (2018);[1] aggravated assault (Class B), 17-A M.R.S. § 208(1)(B) (2022); criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. § 209(1) (2022); 17-A M.R.S. § 1252(4) (2018);[2] three counts of reckless conduct with a dangerous weapon (Class C), 17-A M.R.S. § 211(1) (2018); 17-A M.R.S. § 1252(4); eluding an officer (Class C), 29-A M.R.S. § 2414(3) (2022); and criminal mischief with a dangerous

---

[1] Title 17-A M.R.S. § 201 has since been amended. *See* P.L. 2019, ch. 113, § B-9 (effective Sept. 19, 2019); P.L. 2019, ch. 271, § 2 (effective Sept. 19. 2019); P.L. 2019, ch. 462, § 3 (effective Sept. 19, 2019) (codified at 17-A M.R.S. § 201 (2022)).

[2] Title 17-A M.R.S. § 1252(4) was repealed and replaced with a new section 1604 by P.L. 2019, ch. 113, §§ A-1, A-2 (effective May 16, 2019) (codified at 17-A M.R.S. § 1604(5)(A) (2022)).

2

weapon (Class C), 17-A M.R.S. § 806(1)(A) (2022); 17-A M.R.S. § 1252(4), entered by the trial court (Piscataquis County, *Anderson, J.*) following a nonjury trial.

[¶2] Hallowell contends that the court failed to adequately consider the evidence that he was suffering from a serious mental abnormality that "made it impossible for him to form the requisite intent to kill," and that because evidence was presented at trial that he suffered from an abnormal condition of the mind, there was insufficient evidence to prove intent beyond a reasonable doubt. *See* 17-A M.R.S. § 38 (2018).[3] Hallowell also contends that his "long-standing mental health problems" and the "conflicting version of events" he described to different evaluators constituted "compelling evidence" that the court improperly ignored in its "cursory treatment" of his affirmative defense of insanity. We affirm the judgment.

## I. BACKGROUND

[¶3] "Viewed in the light most favorable to the State, the evidence admitted at trial establishes the following facts." *State v. Graham*, 2015 ME 35, ¶ 2, 113 A.3d 1102. Hallowell and the victim are distant relatives; Hallowell's great-grandmother is the victim's husband's grandmother. The victim and her

---

[3] Title 17-A M.R.S. § 38 has since been amended, though the amendment is not relevant in the present case. *See* P.L. 2019, ch. 462, § 1 (effective Sept. 19, 2019) (codified at 17-A M.R.S. § 38 (2022)).

husband live in Shirley, Maine, and house their animals in a barn located on land owned by Hallowell's great-grandmother. On July 8, 2019, after spending multiple days holed up in his bedroom, Hallowell decided to confront his relatives about what he believed to be their mistreatment of his great-grandmother.[4] In the early hours of the morning, Hallowell packed multiple weapons into a "go-bag" and walked approximately ten minutes to the barn where his relatives kept their animals because he knew that they went to the barn every day to care for the animals. He entered the barn and spent multiple hours waiting for them to arrive. At one point while he was pacing inside the barn, he fed the horses hay because they became restless. At approximately 6:00 a.m., the victim arrived at the barn, entering through the grain room. As she went to feed the first animal, Hallowell "jumped up" and shot her in the hip with a handgun, knocking her to the ground. The victim had been unaware that Hallowell was inside the barn, and Hallowell did not say anything to the victim before shooting her.

---

[4] There was no evidence admitted at trial specifying the nature of what Hallowell considered to be the mistreatment of his great-grandmother. Hallowell referred to the alleged mistreatment as "basic human rights that were not being respected," potentially during the time that the great-grandmother resided with the victim and her husband in their home. The court made explicit findings regarding the intensity of Hallowell's feelings about his great-grandmother's alleged mistreatment that were supported by evidence admitted at trial.

[¶4]  After being shot, the victim turned toward the sound of the gunshot and saw that Hallowell was holding a handgun and had a rifle strapped to his chest.  Hallowell raised the handgun, and the victim got up and ran to a sliding door at the opposite end of the barn.  After failing to open the door,[5] the victim ran the length of the barn, past Hallowell as he fired at her, and left the barn through the grain room door she had entered through.  Hallowell fired at least four more times as the victim tried to escape the barn, although no additional bullets hit the victim.

[¶5]  Hallowell chased after the victim with the rifle when she exited the barn.  Hallowell tased the victim and she eventually stumbled to the ground.  While the victim was on the ground, Hallowell hit her on the head with his rifle.  As the two struggled and wrestled with the weapon, the rifle broke.  Several rounds of live ammunition fell on the ground, indicating that the rifle had been loaded.  Hallowell spoke to the victim for the first time while they were wrestling over the rifle on the ground, stating: "I hate you for what you did to my grandmother."  The victim pleaded with Hallowell to stop the attack.

[¶6]  The victim was able to get away from Hallowell and ran toward the road.  A pickup truck towing a trailer was traveling on the road in front of the

---

[5]  The court found there was a "fairly strong inference" that Hallowell caused the sliding door to malfunction.

property, and the victim was able to wave the truck down and get in. At that point, Hallowell had followed the victim down to the road and was running toward the truck with a handgun. The truck was unable to back up due to its trailer, so the driver sped past Hallowell with the victim lying on the floor of the rear seat. As the truck sped past him, Hallowell aimed at the truck and fired three shots, two of which hit the rim and tire on the rear passenger wheel of the truck. At some point after the pickup truck drove past him, Hallowell returned to his mother's house, spoke to his parents, gathered some items, and left in a vehicle.

[¶7] After law enforcement was notified of the incident, an alert was issued for Hallowell and the vehicle he was suspected to be traveling in. A Maine State Police lieutenant, who was patrolling in an unmarked cruiser, located the suspect vehicle in the town of Clinton. The lieutenant turned on his emergency lights and siren, but the vehicle did not stop. The lieutenant estimated that he pursued the vehicle at speeds up to ninety-five miles per hour over three and a half miles for a total duration of two and a half to three minutes. Eventually the vehicle failed to negotiate a left-hand turn and left the road, landing in a field. After the crash, the driver of the vehicle reported that

6

he was uninjured, identified himself as Christopher Hallowell, complied with law enforcement directives, and allowed himself to be taken into custody.

[¶8] On July 9, 2019, the state charged Hallowell with various crimes in a twelve-count complaint. The court (*Stitham*, *J.*) ordered a mental examination. Dr. April O'Grady conducted the initial evaluation, which included competency and criminal responsibility evaluations, on August 8, 2019, and filed her report with the court. During the evaluation, Hallowell reported that he had a "goal," and that even though he did not intend to hurt anyone, "he was prepared for violence." Hallowell also informed O'Grady that he could "absolutely see" that society would view his behavior as wrong but he "had decided to take justice into his own hands," that "he had considered that type of aggression for years," that "it took a lot for him to consider that type of aggression," and that he thought that if his relatives were "out of the picture, then they [could] not harm [his great-grandmother] anymore." O'Grady reported that in her professional opinion, Hallowell was in contact with reality during the time leading up to the incident in the barn and during his time in the barn.

[¶9] On March 2, 2020, the State filed a superseding indictment. Hallowell entered not guilty pleas on all twelve counts. Hallowell subsequently

underwent additional mental health examinations. The court (*Anderson, J.*) held a competency hearing on December 28, 2020, and found Hallowell incompetent to stand trial. Hallowell was examined again in 2021 and, following a second competency hearing on August 8, 2021, was found competent to stand trial. On August 20, 2021, Hallowell entered a plea of not criminally responsible by reason of insanity. The trial court held a bench trial on August 20 and 23, 2021.

[¶10] At trial, Hallowell raised the defense of mental abnormality, *see* 17-A M.R.S. § 38, and the affirmative defense of insanity, *see* 17-A M.R.S. § 39 (2022). In support of his defenses, Hallowell called Dr. Geoffrey Thorpe, who had evaluated Hallowell approximately two years after the incident. Thorpe testified that Hallowell had been diagnosed with autism spectrum disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder, and various substance abuse disorders. Thorpe also testified that a possible nodule might have been found on Hallowell's thyroid gland, although whether the nodule actually existed or had any effect on Hallowell was unknown.

[¶11] Thorpe testified that Hallowell reported that he had lied to O'Grady during her evaluation and that he experienced delusions, hallucinations, and dissociated states of consciousness. Thorpe testified that Hallowell stated that

8

he carried loaded firearms with him because "he felt the need to defend himself against snakes" in the area, that he injected a homemade concoction of drugs and alcohol before the incident in a suicide attempt, that he heard voices that told him to go to the barn, and that he believed that if he shot one of his relatives, he would be able to seek asylum in Germany. Thorpe also testified, however, that Hallowell subsequently reported that his hallucinations did not begin until he was incarcerated after the incident and that the thoughts Hallowell reported to him "sounded quite improbable and highly unlikely." Thorpe conducted testing of Hallowell and found that the validity of Hallowell's answers raised questions about possible overreporting of symptoms and that the results "could be interpreted but with caution."

[¶12] Ultimately, Thorpe opined that at the time of the crime, Hallowell was "impaired by mental disorders." Thorpe and O'Grady, who was called as a rebuttal witness, both testified that Hallowell might have been malingering when he was questioned about the inconsistencies in his reports to different evaluators as well as in his answers to testing. After a brief deliberation, the court found Hallowell guilty on eight of the charges.[6]

---

[6] The court found Hallowell not guilty on three of the charges, and another charge was dismissed.

[¶13]  In announcing its verdict from the bench, the court stated, with respect to  Hallowell's defenses of mental abnormality and insanity:

> So, I come away from analyzing [the] evidence with the belief that the State has proved beyond a reasonable doubt that when he at least took that first shot he was intending to kill her.  And that might have been a momentary belief in his mind at the time, but . . . I believe the State has proved that it existed.
>
> . . . .
>
> [M]y findings on the insanity defense are very easily explained. . . . [T]he insanity defense would depend on whether the version of events that he gave to Dr. Thorpe was accurate, that he had not been telling the truth to . . . Dr. O'Grady, that he was only really telling what happened to Dr. Thorpe, and I just don't believe that.  I just do not believe that at all.  I believe, consistent with the finding that I've already made, that what he said to Dr. O'Grady was what was going through his mind at the time and not what he said to Dr. Thorpe.  And if you—if you don't have the version that he told to Dr. Thorpe, then you don't have a serious mental illness at all.  So, that's why I'm rejecting the insanity defense.
>
> . . . Abnormal condition of mind is nothing more than proving the intent, and I have already found that the State did prove the intent.  So, although abnormal condition of mind in some quarters is thought of as like a separate—it's not really a separate defense.  It's just whether the State can prove the appropriate mens rea or not, and I have found that they proved that when he shot [the victim] he intended to kill her, and all the other elements of recklessness and things like that are sort of a lesser—lesser form of intent or knowing, so I think it's been proved easily.

[¶14]  For the Class A count of attempted murder (Count 3), the court sentenced Hallowell to thirty years in prison with all but twenty-five years suspended, and four years of probation.  The court imposed concurrent sentences of ten years for the Class B count of aggravated assault; five years for the Class C count of criminal threatening with a dangerous weapon, the three counts of Class C reckless conduct with a dangerous weapon, and the Class C count of eluding an officer; and one year for the Class C count of criminal mischief with a dangerous weapon.  Hallowell timely appealed from the judgment of conviction.

## II.  DISCUSSION

### A.    Mental Abnormality

[¶15]   Hallowell argues the court failed to adequately consider the evidence that he was suffering from a serious mental abnormality and that because evidence was presented at trial that he suffered from an abnormal condition of the mind, there was insufficient evidence to prove intent beyond a reasonable doubt.  *See* 17-A M.R.S. § 38.

[¶16]   "Evidence of an abnormal condition of the mind may raise a reasonable doubt as to the existence of a required culpable state of mind."  *Id*. "The trial court's application of a statutory defense is an issue of law that we

review de novo."  *Graham*, 2015 ME 35, ¶ 15, 113 A.3d 1102.  "When evidence of an abnormal condition of the mind is presented, the court is called upon to determine whether the State has proved beyond a reasonable doubt that the accused acted with the culpable state of mind necessary to commit the crime charged."  *State v. Weyland*, 2020 ME 129, ¶ 25, 240 A.3d 841 (alterations and quotation marks omitted).

[¶17]  "A person is guilty of [Class A] criminal attempt if, acting with the kind of culpability required for the commission of the crime, and with the intent to complete the commission of the crime, the person engages in conduct that in fact constitutes a substantial step toward its commission and the crime is . . . [m]urder."  17-A M.R.S. § 152(1)(A).  "A person acts intentionally with respect to a result of the person's conduct when it is the person's conscious object to cause such a result."  17-A M.R.S. § 35(1)(A) (2022).  "The statutory definition of intentional conduct focuses on the purposeful nature of the conduct and the actor's awareness of its consequences.  Thus, in evaluating whether evidence of the defendant's abnormal mental state raises doubt as to the intentional quality of the defendant's actions, the fact-finder should consider the relationship between the defendant's mental state and evidence that the defendant in fact acted purposefully and appreciated the consequences of his or her actions."

12

*Graham*, 2015 ME 35, ¶ 23, 113 A.3d 1102. "Evidence that a defendant may have been suffering from mental or emotional difficulties does not necessarily suggest that [the] defendant's conduct was not intentional as that term is defined in the criminal code." *Id.* ¶ 22 (alterations and quotation marks omitted).

[¶18] Contrary to Hallowell's contentions, the court properly considered the evidence presented that Hallowell was purportedly suffering from serious abnormalities that made it impossible for him to form the requisite intent for criminal attempt. Although Thorpe testified that he believed Hallowell's capacity was "impaired by mental disorders" and "wasn't at a hundred percent," the State presented the opposite opinion in O'Grady's rebuttal testimony. Furthermore, in a phone call made from the Piscataquis County Jail on October 23, 2019—more than three months after the incident—Hallowell contended that he "had every respect" [*sic*] to shoot his great-grandmother's "abuser," that it was his constitutional right, and that just because the other speaker "don't like it, doesn't mean it's bad."[7]

---

[7] The call included the following exchange:

**Hallowell**: [The guards] have no respect for the 4th amendment, Lynn.

**Called Party**: Ummm, Chris you had no respect and that's why you're there.

[¶19]  "In making its factual findings, the court was permitted to draw all reasonable inferences from the evidence, and decide the weight to be given to the evidence and the credibility to be afforded to the witnesses."  *State v. Mackin*, 2020 ME 78, ¶ 7, 234 A.3d 1232 (quotation marks omitted).  When announcing its findings, the court stated that (1) it did not believe Hallowell's version of events as reported to Thorpe approximately two years after the incident; (2) it believed that Hallowell's report to O'Grady was "what was going through [Hallowell's] mind at the time"; and (3) the State proved beyond a reasonable doubt that, at least in the moment when Hallowell fired the first shot that hit the victim, he intended to kill her.[8]  Thus, the court considered the

---

**Hallowell**: I had no respect?  I had every respect.  That's the whole point.  When the state government refused to protect a ninety-year-old woman, I shot her abuser.  That is just plain simple.  That is my constitutional right as much as it is *[interrupted by Called Party]*

**Called Party**: No, it isn't [interrupted by Hallowell]

**Hallowell**: Yes, it is, Lynn.  The second amendment exists for a reason, Lynn.  I'm not gonna argue about it with you.

Called Party: Alright.

**Hallowell**: She has basic human rights that were not being respected by this [. . .] government.  So somebody does have to take care of her regardless.

**Called Party**: [pause]  M'kay.  [pause]

**Hallowell**: You don't like it, doesn't mean it's bad.

[8]  The court did not make factual findings regarding Hallowell's intent as he beat the tased victim on the head with his rifle.

relationship between Hallowell's mental state and the evidence that Hallowell acted purposefully and appreciated the wrongfulness of his goal-oriented conduct. *See Graham*, 2015 ME 35, ¶ 23, 113 A.3d 1102. In so doing, the court properly placed the burden on the State to prove all elements of the offense, including intent, beyond a reasonable doubt. *See id.* ¶ 26. The evidence supports the court's finding that Hallowell was not suffering from an abnormal condition of the mind that raised a reasonable doubt as to whether he acted intentionally when he shot the victim. *See State v. Norris*, 2016 ME 37, ¶ 19, 134 A.3d 319.

**B. Insanity**

[¶20] Hallowell also contends that his "long-standing mental health problems" and the "conflicting version of events" that he described to different evaluators was "compelling evidence" that the court improperly ignored in its "cursory treatment" of his affirmative defense of insanity.

[¶21] "A defendant is not criminally responsible by reason of insanity if, at the time of the criminal conduct, as a result of mental disease or defect, the defendant lacked substantial capacity to appreciate the wrongfulness of the criminal conduct." 17-A M.R.S. § 39(1). As used in section 39(1), "'mental disease or defect' means only those severely abnormal mental conditions that

grossly and demonstrably impair a person's perception or understanding of reality." *Id.* § 39(2). "The defense of insanity does not raise a reasonable doubt as to an element of the crime, but instead excuses a defendant from criminal responsibility even though the State can prove each element of the crime." *State v. Griffin*, 2017 ME 79, ¶ 9, 159 A.3d 1240. The insanity defense is an affirmative defense that must be proved by the defendant by a preponderance of the evidence. 17-A M.R.S. §§ 39(3), 101(2) (2022); *see Norris*, 2016 ME 37, ¶ 14, 134 A.3d 319.

[¶22] Whether Hallowell met his burden of proof is a question of fact. *Norris*, 2016 ME 37, ¶ 14, 134 A.3d 319. "[I]f the fact-finder decides that the defendant has not met the burden of proof, we will disturb that finding only if the record compels a contrary conclusion. We must review the evidence, and any reasonable inferences that may be drawn from it, most favorably to the result reached by the trial court." *Id.* (citations and quotation marks omitted).

[¶23] It is undisputed that Hallowell has a range of mental health diagnoses. The factual question before the court was whether Hallowell sufficiently proved that he had a "mental disease or defect," as those terms are defined, that resulted in a lack of substantial capacity to appreciate the wrongfulness of his criminal conduct. 17-A M.R.S. § 39(1)-(2). During the

defense's closing, the court conducted a colloquy with defense counsel to clarify what the alleged mental disease or defect was. The defense acknowledged its burden and that the court as the fact-finder would need to "basically believe one [expert] over the other—[Thorpe] as opposed to [O'Grady]"—in order to find that Hallowell met his burden. Ultimately, the court did not believe the version of events that Hallowell described to Thorpe over the version he described to O'Grady, and it therefore rejected the insanity defense.

[¶24] Viewed in the light most favorable to the court's decision, the evidence admitted at the trial did not compel a contrary conclusion. In addition to occurring years after the incident, during which time Hallowell had time to evaluate previous reports, Hallowell's statements about his purported hallucinations and delusions were described even by Thorpe as "improbable" and "highly unlikely." Hallowell also reported to Thorpe that his hallucinations began after he was incarcerated, contrary to his reports that the hallucinations and delusions directed his actions on the morning of July 8, 2019. Although the record might support a conclusion that Hallowell suffers from mental health conditions, it did not compel a finding that he had a "severely abnormal mental condition[] that grossly and demonstrably impair[ed] [his] perception or understanding of reality." 17-A M.R.S. § 39(2); *see Norris*, 2016 ME 37, ¶ 17,

134 A.3d 319. Even Thorpe's testimony that Hallowell was "impaired by mental disorders" at the time of the incident contained nothing further to support Hallowell's contention that those mental disorders were a "mental disease or defect" as those terms are defined by and used within the statute. *See* 17-A M.R.S. § 39(2). The court did not err in finding that Hallowell failed to meet his burden of proof on the affirmative insanity defense.

The entry is:

Judgment affirmed.

---

Maxwell Coolidge, Esq., Ellsworth, for appellant Christopher J. Hallowell

Marianne Lynch, District Attorney and Mark A. Rucci, Dept. Dist. Atty., Prosecutorial District V, Bangor, for appellee State of Maine

Piscataquis County Unified Criminal Docket docket number CR-2019-225
FOR CLERK REFERENCE ONLY